MICHAEL COSTANZO et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30968.)

JACK DI VERONICA et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30969.)

MIKE DI VERONICA et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30970.)

TONY RUSSITANO et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30971.)

TONY RUSSITANO, JR., et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30972.)

JOE TAVERNESE et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30973.)

Court of Claims, February 16, 1955.

*Rocco R. Calli* for claimants.

*Nathaniel L., Goldstein, Attorney-General (James G. Austin* of counsel), for defendant.

RYAN, J. Claimants are the owners of parcels of mucklands lying northwest of the village of Canastota in the town of Lenox, Madison County, New York and bounded generally on the east by Hardwood Island road, on the south by Indian Opening road, on the west-northwest by Tackabury road, which is practically a continuation, at an angle, of Indian Opening road, and on the north by Cowaselon Creek which is paralleled by Ditch Bank road. All of the lands are flat and lie within a contour line of 390 feet above sea level. The muckland area was developed for its particular kind of agriculture as part of the Lenox-Sullivan drainage improvement district. Cowaselon Creek is an artificial channel, running generally from east to west. Among its tributaries are Canastota Creek and Owlville Creek which enter Cowaselon from the south at points 1360 feet and 680 feet east of Hardwood Island road and Colton Ditch which enters Cowaselon from the north at a point 2080 feet west of Hardwood Island road. Lying between the north line of the parcels owned by these claimants and the channel of Cowaselon Creek, but also within the same contour of flatland, is a parcel owned by one Debrucque, not a claimant herein. Debrucque also owns a parcel to the east of Hardwood Island road but we are little concerned with that fact except that such easterly parcel together with the westerly parcel provided the site for some changes in drainage structures made by the State under Hardwood Island road. Particularly, there was installed there a new twin 36-inch concrete pipe culvert which led to the so-called Debrucque ditch over which there is much controversy in the extended record of trial herein. Prior to July, 1951, the Debrucque ditch led in a straight line northwesterly converging towards Cowaselon Creek but first emptied into a ditch leading almost due north from the lands of these claimants before it reached Cowaselon.

The State of New York comes into this picture by virtue of its construction of the Thruway. The particular part of that much publicized boulevard with which we are herein concerned runs

from Station 488+00 on the west to Station 545+00 on the east. Station 488+00 is approximately 960 feet due south of a 2 × 4.5-foot box culvert which already existed under the Indian Opening road at a point 520 feet west on that road from the entrance to Di Veronica's property. In turn that culvert is approximately 2960 feet due south of Cowaselon Creek.

Station 545+00 is approximately 1000 feet east of the point where the Thruway right of way intercepted Indian Opening road as it ran from the west to meet the dead end of Hardwood Island road from the north and to bear off on a tangent to the southeast and to join New Boston road just outside of and to the westerly of the village of Canastota. The contract plans provided that Indian Opening road be taken over the Thruway on a bridge at Station 535+06 (bridge center). To give access to this bridge and to accommodate changes in grade, both Hardwood Island road and Indian Opening road were cut off, diverted and made to join each other in a new location in the northeast quadrant of the area formerly made by their right-angled intersection.

Storminess over New York State during July, 1951, was greater than normally experienced. In the Canastota area precipitation on July 16th was 1.98 inches and on July 18th, 2.60 inches. On July 19th the lands of all of the claimants were flooded and they severally sue the State for damages resulting from their respective losses of growing crops and from alleged permanent impairment of the productivity of their soil by deposits of sand and silt thereon.

Claimants can recover herein only by demonstrating that the State of New York, in the construction of its Thruway, collected in a body surface waters which would not naturally flow in the direction of their lands and by means of drains and ditches cast such waters upon them. (*Barkley* v. *Wilcox*, 86 N. Y. 140, 147, 148; *Anchor Brewing Co.* v. *Village of Dobbs Ferry*, 84 Hun 274, 276, affd. 156 N. Y. 695.)

Actually the Thruway at this location was not completed but was under construction in July, 1951. We have already referred to station numbers on the contract plans. These are main Thruway stationings. There are also station numbers on the P C line, which is the diverted Hardwood Island road, and the P A line, which is the diverted Indian Opening road. In addition, throughout the record, and in many of the requests to find, Station numbers 1, 2, 3, 4 and 5 are alluded to by counsel. These are arbitrary numbers adopted by claimants' counsel and set up at his instance in questioning the witness Scothon and during

his examination designated upon Exhibit 4. They are confusing and we shall refrain from using them as points of reference. Instead we shall refer to official engineering station numbers as they appear upon the contract drawings.

In preparing Thruway plans and in construction, the State of New York provided for drainage structures under the Thruway at points substantially opposite culverts which already existed in Indian Opening road. Thus at Station 488+00 a 24-inch reinforced concrete pipe culvert was constructed under both lanes of the Thruway and under the center mall. This led to a ditch which connected with the 2 × 4.5-foot box culvert under Indian Opening road to which we have referred at the outset of this discussion. A 36-inch reinforced concrete culvert was placed under both lanes of the Thruway as well as the mall thereof in a natural depression at Station 502+90. This culvert drained into Jones Pond which in turn drained into a 30-inch reinforced concrete pipe culvert across Indian Opening road. This 30-inch culvert drained into the claimants' easterly ditches and ultimately into Cowaselon Creek. At Station 514+40, a 24-inch reinforced concrete pipe culvert was placed under the north lane of the Thruway. This culvert would drain toward an 18-inch concrete pipe culvert under Indian Opening road and ultimately into Cowaselon Creek through the claimants' ditches.

A 36-inch reinforced concrete pipe culvert was placed under both lanes and the mall of the Thruway at Station 521+27. This culvert drained through a ditch to a 2.5 × 2.5-foot concrete culvert under Indian Opening road. In the vicinity of Thruway Station 528± an 18-inch concrete pipe culvert was removed from the abandoned spur of Indian Opening road. A series of ditches draining the area to the south formerly flowed through this culvert and into the claimants' ditches. The Thruway intercepted these ditches which led from the south and they were diverted to a 36-inch culvert at Station 534, to which we shall refer later, and through this culvert ultimately to a 42-inch storm sewer, which is also discussed hereinbelow.

On the diverted Indian Opening road at Station P A 16+16 there was placed a 36-inch concrete pipe culvert. The culvert at Station 521+27 was connected with this by a ditch. At Station P A 18+18, an 18-inch concrete pipe culvert was placed connecting a ditch on the south side of the new Indian Opening road with an existing ditch on the north side, and led to a ditch lying between the Costanzo and Tavernese properties. At Station P A 23+84 there was placed a 24-inch concrete pipe culvert. This also connected a ditch on the south side of the new Indian

Opening road with the existing ditch on the north side which led to the ditch dividing the Costanzo and Tavernese properties. At Station P C 2+20 and at Station P C 7+14, 24-inch concrete pipe culverts were placed to give outlets for existing ditches from the loop enclosed by the newly located spurs of Hardwood Island and Indian Opening roads as well as to drain the small ditches constructed along the south side of the Hardwood Island road spur.

We have engaged in this lengthy recital of the nature of the various drainage structures planned and installed in the Thruway, and of their location vis-à-vis structures and ditches under and adjacent to the old and new roads approaching the Thruway bridge, because we believe that the exhibits in evidence fully demonstrate that the designers of the Thruway placed these facilities at strategic points to take advantage of existing conditions and so as not to alter the natural flow of surface water. We have endeavored to put into words that which is depicted graphically on the contract drawings and maps in evidence. Up to this point, then, we are convinced that it has not been shown that as a result of Thruway construction there was a diversion of water from ultimate natural channels such as would bring any greater quantity thereof down to the claimants' land and ditches than they would have been burdened with as a result of the storm of July 19, 1951, had the Thruway not been there.

We now come to the question of the Debrucque ditch. At Station P C 13+00, which is the Debrucque site, the twin 36-inch culvert was installed to replace an existing 18-inch concrete pipe culvert. South of the twin 36-inch culvert, at a distance of approximately 200 feet, there existed under that part of Hardwood Island road which was abandoned a box culvert with an opening 5 × 2.75 feet. This culvert was not replaced but the direction of flow in it was inverted so that water would run from west to east therein whereas it formerly ran from east to west. This change in flow, we think, is in the minds of the claimants, the chief malefactor in the damage they suffered. Its close ally in mischief is the Debrucque ditch. It is not contended that the Debrucque ditch did not exist but rather that it did not begin at the Hardwood Island road. On this point we find that until Dryer opened up the ditch in October, 1951, three months after the flood, it was no more than a shallow furrow in the ground from the outlet of the 36-inch twin culvert at the foot of the slope of Harwood Island road to a point some 60 or 70 feet westerly therefrom. Only from that point on could it really be called a ditch. It reached its maximum depth of about

5 or 6 feet at the point of its convergence with the outlet from Costanzo's land. It is the contention of these claimants, that because Debrucque's land was not sufficiently ditched up to the point where the 36-inch culvert debouched on to it the water thereat spread out, not only over Debrucque's but over claimants' lands as well. State engineers had surveyed Debrucque's lands beginning as early as November 20, 1947, and ultimately the State acquired from him as easement to flood and overflow 46.687 acres, described upon an appropriation map as Parcel 197. But that map was not approved until April 23, 1952, and it superseded one that was filed in the Department of State on July 27, 1951, but which is not before us. Whether or not the easement finally taken was determined upon before or after the flood of July 19, 1951, it does seem certain that it was part of the State's general plan of drainage that the ditch going through Debrucque's property would be utilized. This for the reason that, although the contract drawings did not depict the Debrucque ditch nor provide for enlarging it, nor even for cleaning its channel, they did provide for the 36-inch twin culvert. That had been installed before the flood.

But, again, the real question is: " Did the failure to have the Debrucque ditch connect with the twin culverts result in any more water reaching the mucklands? " In listing the various drainage structures erected along the Thruway we stopped at Station 521+27. It now seems essential to continue our recital of them. The next structure to the east was at Station 534. This consisted of a 36-inch concrete pipe which extended from the south shoulder of the Thruway under both lanes and the center mall to a point on the north shoulder where another 36-inch pipe ran at right angles from the first and in an easterly direction for about 150 feet. There it connected with a 42-inch storm sewer which led to the north for approximately 376 feet and which emptied into an open ditch. In turn this ditch joined an existing ditch lying within the loop area, hereinabove mentioned, formed by the newly built spurs of the Hardwood Island and Indian Opening roads. These ditches carried water from the 42-inch storm sewer to the 5 × 2.75 foot culvert where it flowed easterly through that inverted channel to the east side of Hardwood Island road, thence northerly in an existing ditch along the foot of the easterly slope of that road to the 36-inch twin culvert at Station P C 13+00. There is a cut section on the Thruway proper which extends from Station 522 to Station 540. Station 534 is the lowest point in that cut section. In this stretch and leading to the 36-inch culvert under the Thruway

the plans, as modified, called for a ditch along the south side of the Thruway from Station 523 to Station 531+40, approximately. That ditch led to a drop inlet connected by a 24-inch pipe to the culvert at Station 534. Also on the south side another ditch running west to east for 300 feet and almost parallel with the first but distant 60 to 100 feet therefrom connected with a 24-inch pipe which led to the same culvert. On the north side there was a ditch at Station 523, which ran along the Thruway to a 24-inch pipe at Station 530+48. This 24-inch pipe was connected with a manhole which, in turn, was connected with the 36-inch culvert at Station 534. The point of connection was the northerly terminus of that culvert where, as we have said, it was joined at right angles to the 36-inch pipe running to the east. On July 19, 1951, all of these drainage structures in the bridge area were in place, with the exception of a short section of one of the ditches along the south side of the Thruway, a 24-inch concrete pipe in the south bank thereof at Station 534+00, and a 6-inch tile drain on the north side which was not laid until July 25, 1951. The absence of these three features had no material effect upon the conditions considered herein.

East of the bridge area and at Station 541+50 a 24-inch reinforced concrete pipe culvert was placed under both lanes as well as under the mall of the Thruway. This culvert drained into an existing 2-foot ditch which ran approximately 400 feet north thence west to the easterly side of Hardwood Island road thence northerly through the road ditch to the twin 36-inch culvert at Station P C 13+00. Prior to the construction of the Thruway the area south and southeast of the intersection of Hardwood Island and Indian Opening roads drained through the 5 × 2.75-foot culvert (now inverted) under Hardwood Island road and into the ditch between the Tavernese and Debrucque properties.

As we noted in the beginning the claimants' lands were located in a low area, lying for the most part below the 390-foot contour. To the south of Indian Opening road the terrain rose to a crest of 503 feet at the top of Allis Hill. To the east of Allis Hill and south of the claimants' properties there extended a ridge whose 450-foot elevation tapered down to 425 feet as it ran east to a point approximately 1200 feet south of the intersection of Indian Opening and Hardwood Island roads. Prior to any Thruway construction this general area comprising approximately 0.54 square miles or 347 acres drained through natural channels towards the claimants' lands and through their ditches. It was this drainage area which was traversed by the

Thruway running from west to east practically along the 410-foot contour.

The Thruway was so constructed that any water falling upon it west of Station 475 would flow west and away from the claimants' properties. Any water falling upon it between Station 475 and Station 488, together with the drainage from the terrain to the south would be received by the culvert at Station 488 and would flow from there to Cowaselon Creek via a system of ditches independent and apart from the claimants' ditches and through an area to the west of claimants' lands. From Station 488, the Thruway descended on a grade of 0.86% to the east to the culvert at Station 502+00. It then ascended on a grade of 0.03% to Station 509+50 whence it descended on a grade of 0.314% to Station 520+00 and thence on a grade of 0.98% to Station 534+00. From this point it ascended to the east on a grade of 0.98% to Station 541+50. East of that, the flow was to the east and away from the claimants' properties.

To sum up the situation, between Station 488+00 and Station 541+50 the Thruway intercepted a single drainage area. Thus no greater run off of water was brought to the scene by reason of Thruway construction. Removal of sod and trees, clearing and grubbing, excavation, filling and grading may have increased the rapidity of the surface water on the occasion of the heavy rainfall experienced in July, 1951. But this was a public improvement and the record is devoid of evidence of negligence either in design or in construction. Without such evidence where is the liability? (*Matter of Radcliff* v. *Mayor of Brooklyn,* 4 N. Y. 195; *Lynch* v. *Mayor of City of N. Y.,* 76 N. Y. 60; *Watson* v. *City of Kingston,* 114 N. Y. 88; *Klein* v. *Town of Pittstown,* 241 App. Div. 202; *Fox* v. *City of New Rochelle,* 240 N. Y. 109.) In the bridge area, water which under previously existing conditions would have flowed from the south directly to claimants' ditches, was diverted by way of the 42-inch storm sewer and its connecting ditches to the twin 36-inch culvert at Station P C 13+00 and thence on to Debrucque's land. This is the only actual diversion resulting from Thruway construction. It is very possible that some of the water so diverted from the bridge area which spread over Debrucque's land eventually found its way to claimants' lands. But by that time the flow included water which prior to Thruway construction would have reached claimants' ditches by other routes, notably via the 18-inch culvert under the abandoned spur of Indian Opening road, which culvert was removed, and by the 5 × 2.75-foot culvert under Hardwood Island road, which was inverted, but which

formerly led to the Tavernese-Debrucque line ditch. Claimants' lands were saturated with the heavy rainfall. Their ditches were filled and overflowing with storm waters which would have reached them anyway. It cannot be said upon the record before us that by reason of the Thruway construction any greater burden was cast upon them. Besides that, Cowaselon Creek went out of its banks in the proximity of its confluence with Owlville Creek and floodwaters from that point flowed in the direction of Hardwood Island road, went over that road and commingled with the other waters.

One further item remains. The claimant Costanzo contends that certain mounds of earth, placed along the Thruway right of way, held back rain water falling in their vicinity; that on July 19, 1951, someone, in the employ of the State or of its contractor, using a bulldozer cut drainage holes in such mounds thereby increasing the flow of water and bringing down upon claimants' lands deposits of silt and other foreign substances. Although the general foreman of the contractor testified that no bulldozer owned or operated by it worked on July 19, 1951, it seems reasonable to us that it was desirable that the impounded waters be released from the contract site as soon as possible and we believe that such action was taken. However, we do not find that it had any material effect upon the flood situation nor that actionable negligence derives from it.

The trial of this action occupied 10 very crowded days, the record totals 1941 pages, the exhibits are numerous. The Attorney-General has generously submitted the appalling number of 145 requests to find facts. The claimants' attorney has submitted 75 requests on behalf of Costanzo and 12 additional ones on behalf of each other claimant. If this opinion seems long we plead the foregoing facts in extenuation. Upon it and upon the requests as found or refused we conclude that each claimant has failed to establish facts sufficient to constitute a cause of action against the State of New York and that his claim must be dismissed. Enter separate judgments accordingly.